IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 9, 2016 at Nashville

**JACOB BROWN v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Tipton County**
**No. 6861     Joseph H. Walker, Judge**

---

**No. W2015-00887-CCA-R3-PC  -  Filed April 15, 2016**

---

The petitioner, Jacob Brown, appeals the denial of his petition for post-conviction relief, which petition challenged his 2012 convictions of two counts of first degree murder and the accompanying sentences of life without parole. In this appeal, the petitioner contends that the trial court's denial of funds for an expert prior to the transfer hearing ran afoul of his due process rights, that he was denied the effective assistance of counsel, and that the consecutive sentences of life without parole, imposed when the petitioner was a juvenile, violate the Eighth Amendment prohibition on cruel and unusual punishment. The petitioner's claims of a violation of his due process rights and deprivation of his right to the effective assistance of counsel were previously determined and cannot avail him of post-conviction relief. We conclude that the imposition of a sentence of life without parole in this case did not violate the Eighth Amendment prohibition on cruel and unusual punishment but that consecutive alignment of the petitioner's sentences does not comport with the recent rulings of the United States Supreme Court. Therefore, we remand the case for the entry of corrected judgment forms reflecting concurrent alignment of the sentences.

**Tenn. R. App. P. 3; Judgment of the Circuit Court Affirmed in Part; Reversed and Remanded in Part**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT L. HOLLOWAY, JR., JJ., joined.

Bryan R. Huffman, Covington, Tennessee, for the appellant, Jacob Andrew Brown.

Herbert H. Slatery III, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Mike Dunavant, District Attorney General; and Sean Hord, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On January 19, 2012, a Tipton County Circuit Court jury convicted the then 16-year-old petitioner of two counts of first degree murder and one count of especially aggravated burglary and, following a sentencing hearing, determined that the petitioner should be sentenced to life without the possibility of parole for the murder convictions. The trial court imposed a sentence of eight years to be served at 100 percent for the especially aggravated burglary conviction and ordered that all the sentences be served consecutively. *See State v. Jacob Andrew Brown*, No. W2012-01297-CCA-R3-CD, slip op. at 1-2 (Tenn. Crim. App., Jackson, Aug. 7, 2013), *perm. app. denied* (Tenn. Dec. 10, 2013).

The facts, as summarized by this court on direct appeal, established that on January 18, 2011, the 16-year-old petitioner left school early and asked William Archer to drive him to the home of Randall Scott Locke, Jr. *See id.*, slip op. at 2. On their way, the two boys stopped at a "smoke shop," and the petitioner purchased "two packets of Charge, a substance labeled as 'bath salts.'" *Id.* The petitioner "snorted the Charge at the skate park, and Mr. Archer took him to the Locke house." *Id.* When the petitioner found the Locke house locked and empty, he waited on the porch for some time before he went across the street to the home owned by the victims, "Ed and Bertha Walker, who were 80 and 75 years old respectively." *Id.* Later that day, the victims' daughter found them beaten to death inside their home. After he became a suspect, the petitioner eventually gave the following statement to the police:

> "I left school between 12:30 p.m. and 1:00 p.m. I walked around the neighborhood near the ball fields. I walked through the graveyard and to the skate board park. I walked to Scott Locke's house on Wiley. I don't really recall what time I got there. I sat at Scott's house and played with the dogs and walked around his porch. The house was locked, and I wasn't able to get in.
>
> The mailman came up, and I signed for a package for Mr. Randy. I put the package on the porch on the ledge. It wasn't a package. It was just mail you had to sign for.
>
> A little bit after I signed for the mail I walked over to the Walkers. I went over to ask to use the restroom. I knocked on the door, and Mr. Walker came to the door. I asked him if I could use his restroom. He let me in and asked me if I was locked out of the house. I told him I was, and he

said to come on in, and he pointed to the direction of the restroom.  I went and used the restroom. I came out of the restroom and went to the living room and talked to Mr. Walker.  I told him he had a nice house.  He was sitting in a chair.  I was standing.

All of a sudden I became very angry.  I don't think he said anything that would cause me to get angry.  I said thanks and left.  We did not argue or he did not know I was angry.  I walked across to Scott's and got an aluminum baseball bat.  I walked back over to the Walkers with the bat.  I put the bat behind me under my coat.  I was hiding it.

I walked back and knocked again, and Mr. Walker came to the door again.  I don't recall saying anything.  He opened the door.  There is probably more, but I don't remember.  Some of the things are blank to me.  I went to the front door on the porch, not the door at the driveway.  We were both standing in the living room.  I did not say anything to him.  I just pulled the bat from behind my back, swung and hit him in the forehead in the front.  He did not fall, so I kept hitting him.  He eventually fell face down.

His wife was screaming and came into the room.  I pushed her, and she fell into the dining room.  She was on the ground and I started swinging and hitting her.  I really don't know where I was hitting her.  I don't know how many times I hit her or Mr. Walker.  I didn't stop until they were not moving anymore.

I then left out the same door I came in.  I think I locked the door behind me, but I really can't remember.  I walked back over to Scott's and threw the bat beside the house in some trash.  I just sat down on a basket thing in the back yard and didn't move.  I sat there until Scott came home.  After I put the bat down and before I sat down, I washed my hands in a puddle of water in the back yard.  I think I also washed my face with the water in the puddle.  When Scott came home, his mom and sister were in the truck with him.

The story picks up and is exactly like I told you in the first statement from this point. As I sat in the back yard I was still angry and confused. I just couldn't stop. I didn't say anything while I was hitting them.

*Id.*, slip op. at 4-6.

This court affirmed the petitioner's first degree murder convictions as well as the imposition of sentences of life without the possibility of parole but modified the especially aggravated burglary conviction to a conviction of aggravated burglary and remanded for a new sentencing hearing on that count. *Id.*, slip op. at 18.

On October 3, 2014, the petitioner filed a timely petition for post-conviction relief, alleging that his convictions were the product of a coerced confession, that the convictions were based on a violation of the petitioner's privilege against self-incrimination, that the convictions were based on the State's failure to disclose exculpatory evidence, that the convictions violated double jeopardy protections, that he was denied the effective assistance of counsel, and that newly discovered evidence cast doubt upon his convictions. The petitioner filed pro se two amended petitions before the post-conviction court appointed counsel. The petitioner's appointed counsel did not file any further amended petitions.

At the April 22, 2015 evidentiary hearing, Doctor Fred Steinberg, who testified as an expert witness at the petitioner's trial, testified that he evaluated the petitioner, who was by then 17 years old, and determined him to be competent to stand trial. Doctor Steinberg also determined that although the petitioner was schizophrenic, his mental disease could not support an insanity defense, saying, "clearly [the petitioner] was mentally ill, but he knew the wrongfulness of his actions." He could not say whether a defense of diminished capacity could be supported. Doctor Steinberg did conclude that the petitioner was, at the time of the evaluation, "committable to a psychiatric facility due to being a danger to himself and others."

Trial counsel testified that he was appointed to represent the petitioner prior to his transfer from juvenile court. Although he was initially second chair, he eventually became lead counsel. Counsel said that he interviewed the petitioner's parents and the mental healthcare providers who had treated the petitioner during a previous voluntary commitment. He said that he filed an ex parte motion for funds for an independent psychiatric evaluation prior to the transfer hearing but that the juvenile court denied the motion, finding that the petitioner was "not really entitled to that." Counsel said that the juvenile judge also mentioned his concerns about the cost to the county of providing such an evaluation. Counsel said that he "absolutely" believed an evaluation by an

-4-

independent defense expert would have altered the juvenile court's decision to transfer the petitioner to adult court. Counsel testified that, without the benefit of an expert, "it was impossible . . . under the law to do what needed to be done." He added that he believed it to be "a matter of indigence" because the juvenile court "couldn't have stopped a private psychiatrist, paid by private funding, by his family, from going to see him and rendering some kind of an evaluation." He added, however, that he did not believe that a private evaluation would have changed the juvenile court's mind because the court mistakenly believed that "you can't be committed legally because you're being held without bond."

Counsel said that he presented the petitioner's mental health history, including his history of psychosis and commitment, to the jury in addition to trying to emphasize the likely impact that the bath salts had on the petitioner's mental state at the time of the murders. Even with the assistance of Doctor Steinberg's testimony, the evidence available simply could not support an insanity defense. He said that in hindsight, however, he felt that he should have tried to argue that the petitioner was not guilty by reason of mental defect. He testified that the petitioner testified on his own behalf at the sentencing hearing and that "there were some moments that indicated that his contact with reality was still impaired."

Counsel acknowledged that he raised the issue of ineffective assistance of counsel "[i]ndirectly" on grounds that "no counsel could be effective if the judge" does not allow the presentation of proof. He emphasized that he felt limited by the juvenile court's refusal of funds to hire an expert.

At the conclusion of the hearing, the post-conviction court took the petition under advisement. In a written order denying post-conviction relief, the court found that trial counsel did not perform deficiently in any of the areas alleged by the petitioner, noting that counsel went to "great lengths" to ascertain the petitioner's mental health and to present evidence on that issue to the jury.

In this appeal, the petitioner contends that the juvenile court's denial of funds for an expert prior to the transfer hearing ran afoul of his due process rights, that he was denied the effective assistance of counsel, and that the consecutive sentences of life without parole, imposed when the petitioner was a juvenile, violate the Eighth Amendment prohibition on cruel and unusual punishment.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-

-5-

conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

### *I. Petitioner's Claims Related to the Transfer Hearing*

The petitioner contends that the juvenile court's failure to grant him funds to hire an expert witness to examine his mental health prior to the transfer hearing violated due process principles. Additionally, he claims that the court's ruling "hamstrung" his trial counsel such that trial counsel could not be constitutionally effective during the transfer proceeding. As the State correctly points out, both of these claims have been considered and rejected.

On direct appeal, the petitioner challenged his transfer from the juvenile court to the circuit court, arguing, among other things, "that . . . the juvenile court's denial of funding for an independent psychological evaluation precluded a fair and impartial determination regarding committability" *Id.*, slip op. at 7. As part of his challenge to the transfer process, the petitioner also complained "that the juvenile court's denial of funding for the procurement of his own psychological evaluation predetermined that he would be transferred and this violated his right to due process and effective assistance of counsel." *Id.*, slip op. at 12. He argued that "his right to due process was violated because the denial of his request for funding for a psychological examination prevented him from confronting and effectively cross-examining witnesses," *id.*, and "that the failure of defense counsel to secure a mental evaluation is de facto deficient representation," *id.*, slip op. at 13.

This court fully addressed and rejected each claim. With regard to the petitioner's claim that the denial of expert funds by the juvenile court violated due process principles, we held,

> The Advisory Commission suggests that the best practice is for the court to order testing and evaluation. In the case at hand, the juvenile court followed this suggestion. On January 24, 2011, the juvenile court ordered an outpatient evaluation of [the petitioner] by West Tennessee Forensic Services. Furthermore, the juvenile court did not restrict [the

petitioner's] cross-examination of Dr. Nichols. Because the juvenile court acted precisely as directed in the Advisory Commission Comments to Rule 24 and was allowed to fully cross-examine Dr. Nichols, we conclude [the petitioner's] due process rights were not violated.

*Id.* With regard to the petitioner's claim of ineffective assistance of counsel, we held,

In this case, trial counsel filed a motion requesting funding to pay for his own evaluation of [the petitioner's] mental health. The trial court denied the motion. We cannot find any fault on the part of trial counsel. He filed a motion which was denied by the trial court. There was no deficiency in counsel's representation of [the petitioner] in this regard.

*Id.*, slip op. at 13.

The State argues that the petitioner's claims of due process violation and ineffective assistance of counsel related to the juvenile court's denial of funds were previously determined on direct appeal and cannot be heard in this post-conviction proceeding. The petitioner does not address the issue of previous determination in his appellate brief, but he claimed at the evidentiary hearing that neither claim was previously determined because he had not aired the claims at a full and fair hearing. "A ground for relief is previously determined if a court of competent jurisdiction has ruled on the merits after a full and fair hearing." *See* T.C.A. § 40-30-106(h). "A full and fair hearing has occurred where the petitioner is afforded the opportunity to call witnesses and otherwise present evidence, regardless of whether the petitioner actually introduced any evidence." *Id.* As indicated above, the petitioner raised these two exact issues on direct appeal, after presumably raising them in his motion for new trial. *See* Tenn. R. App. P. 3(e) ("[I]n all cases tried by a jury, no issue presented for review shall be predicated upon error in . . . [any] ground upon which a new trial is sought, unless the same was specifically stated in a motion for a new trial; otherwise such issues will be treated as waived."); *see also State v. Martin*, 940 S.W.2d 567, 569 (Tenn. 1997) (holding that a defendant relinquishes the right to argue on appeal any issues that should have been presented in a motion for new trial but were not raised in the motion). In any event, this court considered and rejected the claims.[1] In consequence, we agree with the State that the petitioner's claims that the juvenile court's denial of funds violated due process principles and deprived him of the right to the effective assistance of counsel at

---

[1] The danger of previous determination is the reason this court has repeatedly warned that claiming ineffective assistance of counsel on direct appeal is "a practice fraught with peril." *State v. Thompson*, 958 S.W.2d 156, 161 (Tenn. Crim. App. 1997).

the transfer hearing have been previously determined and may not form a basis for post-conviction relief. *See Cauthern v. State*, 145 S.W.3d 571, 599 (Tenn. Crim. App. 2004) ("When a claim has been previously determined, it cannot form the basis for post-conviction relief.").[2]

## II. Eighth Amendment

The petitioner, citing *Miller v. Alabama*, 132 S. Ct. 2455 (2012), argues that the consecutive sentences of life without the possibility of parole imposed in this case violate the Eighth Amendment prohibition on cruel and unusual punishment. The State asserts that the petitioner's sentences do not run violate constitutional protections.

In *Miller,* the United States Supreme Court held "that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders." *Miller v. Alabama*, 132 S. Ct. 2455, 2469 (2012). The Court reserved for another day the "argument that the Eighth Amendment requires a categorical bar on life without parole for juveniles" but warned that given "children's diminished culpability and heightened capacity for change, we think appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* Emphasizing "the great difficulty . . . of distinguishing at this early age between 'the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption,'" *id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 573 (2005); *Graham v. Florida*, 560 U.S. 48, 68 (2010)), the Court concluded that the sentencer must "take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison," *Miller*, 543 U.S. at 2469. The Court was careful to note that the "decision does not categorically bar a penalty for a class of offenders or type of crime" but instead "mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty. *Id.* at 2471.

In January 2016, the Court revisited *Miller* in *Montgomery v. Louisiana*, this time to determine whether the ruling in *Miller* should be applied retroactively to convictions that were final when *Miller* was decided in 2012. *See Montgomery v. Louisiana*, 136 S. Ct. 718 (2016). In 1963, 17-year-old Henry Montgomery murdered a deputy sheriff in East Baton Rouge and was sentenced to a term of life imprisonment without the possibility of parole. *See id.* at 725-26. "The sentence was automatic upon the jury's verdict, so Montgomery had no opportunity to present mitigation evidence to justify a less severe sentence." *Id.* at 726. Following the ruling in *Miller*, Montgomery

---

[2] The petitioner did not claim as a ground for relief that trial counsel's decision to raise the issue of ineffective assistance of counsel on direct appeal did not, itself, deprive him of the right to the effective assistance of counsel on direct appeal.

sought collateral review of his sentence by filing a motion to correct an illegal sentence in the East Baton Rouge trial court. That court denied relief on grounds that *Miller* did not apply retroactively to cases on state collateral review. *Id.*

Justice Kennedy, writing for the five person majority, began the analysis by considering whether the rule announced in *Teague v. Lane*, 489 U.S. 288 (1989), that "courts must give retroactive effect to new substantive rules of constitutional law" was an interpretation of federal habeas corpus law or a constitutional command that was also applicable to state collateral review. *Id.* at 728. The Court concluded that "*Teague*'s conclusion establishing the retroactivity of new substantive rules is best understood as resting upon constitutional principles" and held "that when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule." *Id.* at 729.

Having concluded that new substantive rules of constitutional law must be applied retroactively, the Court moved on to the question of whether *Miller* announced a new substantive rule of constitutional law and answered in the affirmative, concluding,

> Because *Miller* determined that sentencing a child to life without parole is excessive for all but "the rare juvenile offender whose crime reflects irreparable corruption," it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status" – that is, juvenile offenders whose crimes reflect the transient immaturity of youth.

*Id.* at 734 (citations omitted). The Court conceded that "*Miller*, it is true, did not bar a punishment for all juvenile offenders" but observed that "*Miller* did bar life without parole, however, for all but the rarest of juvenile offenders, those whose crimes reflect permanent incorrigibility." *Id.* The Court emphasized that "[a]fter *Miller*, it will be the rare juvenile offender who can receive" a sentence of life without parole and concluded that "[t]he fact that life without parole could be a proportional sentence" for those offenders "whose crimes reflect irreparable corruption does not mean that all other children imprisoned under a disproportionate sentence have not suffered the deprivation of a substantive right." *Id.*

The Court also acknowledged *Miller*'s procedural component, noting that *Miller* requires a sentencer to consider a juvenile offender's "'youth and attendant characteristics before determining that life without parole is a proportionate sentence.'" *Id.* (quoting *Miller*, 132 S. Ct. at 2460). The Court observed that "[t]here are instances in which a substantive change in the law must be attended by a procedure that enables a

prisoner to show that he falls within the category of persons whom the law may no longer punish" and stated that "[t]hose procedural requirements do not . . . transform substantive rules into procedural ones." *Montgomery*, 136 S. Ct. at 735. Importantly, the Court stopped just shy of requiring "trial courts to make a finding of fact regarding a child's incorrigibility," leaving that task, instead, to "the State's sovereign administration of their criminal justice systems." *Id.* The Court warned, however, that the fact that "a formal factfinding" is not required "does not leave States free to sentence a child whose crime reflects transient immaturity to life without parole." *Id.*

The Court also noted that "[g]iving *Miller* retroactive effect" does not overly burden the States by requiring that they relitigate sentences "in every case where a juvenile offender received mandatory life without parole" and suggested that "[a] State may remedy a *Miller* violation by permitting juvenile homicide offenders to be considered for parole, rather than by resentencing them." *Id.* at 736. Having thus concluded that *Miller* announced a new substantive rule of constitutional law that required retroactive application, the Court reversed the Louisiana trial court's denial of Montgomery's motion and remanded the case so that Montgomery could "be given the opportunity to show that [his] crime did not reflect irreparable corruption." *Id.*

The dissent authored by Justice Scalia and joined by three others took issue with each of the Court's conclusions: "The Court has no jurisdiction to decide this case, and the decision it arrives at is wrong." *Id.* at 738, (Scalia, J., dissenting). Justice Scalia stated that the Court "created jurisdiction by ripping *Teague*'s first exception from its moorings, converting an equitable rule governing federal habeas relief to a constitutional command governing state courts as well." *Id.* at 742-43 (Scalia, J., dissenting). With regard to the majority's treatment of *Miller*, Justice Scalia stated that "[i]t is plain as day that the majority is not applying *Miller*, but rewriting it," leaving "[f]ederal and (like it or not) state judges henceforth to resolve the knotty 'legal' question" whether the juvenile "was seen to be incorrigible when he was sentenced." *Id.* at 743-44 (Scalia, J., dissenting). Justice Scalia emphasized that the majority's interpretation of *Miller* "makes the imposition of" a sentence of life without parole for a juvenile offender "a practical impossibility." *Id.* at 744.

To be sure, the petitioner's sentence of life without parole was not mandatory and was not imposed automatically. Instead, the petitioner was sentenced by a jury to life without parole only after a sentencing hearing at which he was permitted to present mitigation evidence, *see* T.C.A. § 39-13-204(c),[3] including, according to trial

---

[3] Tennessee Code Annotated section 39-13-204, regarding the sentencing procedure following a conviction of first degree murder, provides, in pertinent part, as follows:

In the sentencing proceeding, evidence may be presented as to any matter

counsel's testimony at the evidentiary hearing, evidence that emphasized his youth, immaturity, and expert testimony regarding his mental illness. The question that must be answered by this court is whether that procedure was sufficient to protect the petitioner's constitutional rights in light of the expanded reading of *Miller* offered in *Montgomery*. We hold that it was. As indicated, the Court reiterated that "*Miller* did not require trial courts to make a finding of fact regarding a child's incorrigibility" but only required "[a] hearing where 'youth and its attendant characteristics' are considered as sentencing factors . . . to separate those juveniles who may be sentenced to life without parole from those who may not." *Id.* at 735. *But see id.* at 734 ("Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "'unfortunate yet transient immaturity.'" (quoting *Miller*, 132 S. Ct. at 2469)). The petitioner received such a hearing.[4] *See* T.C.A. § 39-13-204(f)(2) ("If the jury unanimously determines that a statutory aggravating circumstance or circumstances have been proven by the state beyond a reasonable doubt, but that such circumstance or circumstances have not been proven by the state to outweigh any mitigating circumstance or circumstances beyond a reasonable doubt, the jury shall, in its considered discretion, sentence the defendant either to imprisonment for life without possibility of parole or to imprisonment for life. The trial judge shall instruct the jury that, in choosing between the sentences of imprisonment for life without possibility of parole and imprisonment for life, the jury shall weigh and consider the statutory aggravating circumstance or circumstances proven by the state beyond a reasonable doubt and any mitigating circumstance or circumstances."). As a result, we cannot say that the petitioner's sentence of life without parole runs afoul of the rulings in *Miller* or *Montgomery*.

---

that the court deems relevant to the punishment, and may include, but not be limited to, the nature and circumstances of the crime; *the defendant's character, background history, and physical condition*; any evidence tending to establish or rebut the aggravating circumstances enumerated in subsection (i); and any evidence tending to establish or rebut any mitigating factors. Any such evidence that the court deems to have probative value on the issue of punishment may be received, regardless of its admissibility under the rules of evidence; provided, that the defendant is accorded a fair opportunity to rebut any hearsay statements so admitted.

T.C.A. § 39-13-204(c) (emphasis added).

[4] The courts in several other states have concluded that so long as the sentencing court considers the juvenile offenders' age and immaturity it need not consider a specific set of factors. *See, e.g.*, *People v. Holman*, No. 5–10–0587, 2016 WL 868413, at *9-10 (Ill. App. Ct. Mar. 3, 2016); *State v. Ali*, 855 N.W.2d 235, 256–57 (Minn. 2014); *State v. Long*, 8 N.E.3d 890, 899 (Ohio 2014); *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012).

That being said, we have misgivings about the consecutive nature of the petitioner's sentences in light of the Supreme Court's repeated emphasis that "children are constitutionally different than adults," *id.* at 736, and its warnings against the imposition of excessive punishments against juvenile offenders. If, as the Supreme Court has informed us, "life without parole is excessive for all but 'the rare juvenile offender,'" *id.* at 734, and that life without parole is, indeed, the most severe sentence that may be imposed on a juvenile offender, *id.* at 736 (citing *Roper v. Simmons*, 543 U.S. 551 (2005) for the proposition "that the Eight Amendment prohibits capital punishment for those under the age of 18 at the time of their crimes"); *id.* at 733 (stating that "*Miller* recognized that "the distinctive attributes of youth diminish the penological justifications" for imposing life without parole on juvenile offenders" (citing *Miller*, 132 S. Ct. at 2465)), then consecutive sentences of life without parole for a juvenile offender seem suspect. *Cf. Vasquez v. Com.*, 781 S.E.2d 920, 934 (Va. 2016) ("The Court's holdings in *Miller* and *Montgomery* support the conclusion that any distinction between explicit and de facto life sentences without parole is one without a difference. . . . We cannot ignore the reality that a seventeen year-old sentenced to life without parole (Graham) and a sixteen year-old sentenced to a term of years beyond his lifetime (Vasquez) have effectively received the same sentence. Because both sentences deny the juvenile the chance to return to society, *Graham* applies to both sentences."); *State v. Pearson*, 836 N.W.2d 88, 96 (Iowa 2013) ("Though *Miller* involved sentences of life without parole for juvenile homicide offenders, its reasoning applies equally to Pearson's sentence of thirty-five years without the possibility of parole for these offenses. Therefore, we think a minimum of thirty-five years without the possibility of parole for the crimes involved in this case violates the core teachings of *Miller*." (citations omitted)); *Funchess v. Prince*, No. CV 14-2105, 2016 WL 756530, at *5 (E.D. La. Feb. 25, 2016) (examining "a sentence of life without parole for a period of 40 years" and the attendant "obstacles" to obtaining parole "under Louisiana's 'two-step parole procedure'" and concluding that "for all intents and purposes" such a sentence equates "to a mandatory life sentence with no meaningful opportunity to obtain release" in violation of *Miller* and *Montgomery*). Given the Court's teachings that a sentence of life without parole represents the upper limit of juvenile sentencing for any juvenile, we find that reversal of the imposition of consecutive sentences is necessary in this case. Accordingly, we reverse the imposition of consecutive sentences and remand the case for the entry of corrected judgments reflecting concurrent alignment of all the petitioner's sentences.

## Conclusion

Because those claims were considered and rejected by this court on direct appeal, the petitioner's claims of a violation of his due process rights and deprivation of his right to the effective assistance of counsel were previously determined and cannot

avail him of post-conviction relief. We conclude that the imposition of a sentence of life without parole in this case did not violate the Eighth Amendment prohibition on cruel and unusual punishment in light of Tennessee's individualized sentencing procedure but that consecutive alignment of the petitioner's sentences does not comport with the recent rulings of the United States Supreme Court. Therefore, we remand the case for the entry of corrected judgment forms reflecting concurrent alignment of the sentences.

_____
JAMES CURWOOD WITT, JR., JUDGE